NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF (CABN 141489)
Assistant United States Attorney
Chief, General Civil Section

CHRISTOPHER J. SMITH (VABN 75445)
Associate Director
REBECCA A. HACISKI (DCBN 996656)
Trial Attorney
KATELYN B. BENTON (DCBN 1020272)
Trial Attorney
        Office of International Affairs
        Criminal Division
        U.S. Department of Justice
        1301 New York Avenue NW
        Washington, D.C. 20530
        Telephone: (202) 616-2534
        Fax: (202) 514-0080
        Email: Rebecca.Haciski@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HAKOP MENESHIAN,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>　　　　Defendants. | No. 2:19-cv-09394-CJC-AFM<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; DECLARATION BY TOM HEINEMANN**<br><br>Judge: Honorable Cormac J. Carney<br>Courtroom: 7C<br>Hearing: December 16, 2016<br>Time: 1:30 pm |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION ......................................................................................1

II.  PROCEDURAL AND FACTUAL BACKGROUND ............................2

III. ARGUMENT.................................................................................................4

    A.   Legal Standard ....................................................................................4

    B.   The Court Lacks Subject Matter Jurisdiction to Grant the Requested

        Injunction...................................................................................................5

    C.   Meneshian Has No Likelihood of Success on the Merits .............................7

        1.   Meneshian Has No Fifth Amendment Due Process Right to Avoid

               Return from Ukraine ...........................................................................8

        2.   Extradition May Be Sought Without a Treaty or Other Authority...10

        3.   There Is a Valid Treaty Basis for Meneshian's Extradition .............13

        4.   Meneshian's Claims Fail Pursuant to the Fugitive Disentitlement

               Doctrine............................................................................................15

    D.   Meneshian Fails to Show that He Will Suffer Irreparable Injury Absent

        Injunctive Relief ..................................................................................16

    E.   The Balance of Hardships and Public Interest Weigh Against Entering an

        Injunction ............................................................................................17

IV.  CONCLUSION................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ................................................................... 5

*Artukovic v. Rison,*
784 F.2d 1354 (9th Cir. 1986) .......................................... 16, 17

*Austin v. Healey,*
5 F.3d 598 (2d Cir. 1993) ............................................................ 6

*Blaxland v. Commonwealth Dir. of Public Prosecutions,*
323 F.3d 1198 (9th Cir. 2003) .................................................... 5

*Boumediene v. Bush,*
553 U.S. 723 (2008) ................................................................... 9

*Caribbean Soup Co., Inc. v. Baldridge,*
844 F.2d 668 (9th Cir. 1988) .................................................. 16

*Casey v. Dep't of State,*
980 F.2d 1472 (D.C. Cir. 1992)……………………..……………………7

*Charlton v. Kelly,*
229 U.S. 447 (1913) ................................................................. 14

*Conforte v. Comm'r of Internal Revenue,*
692 F.2d 587 (9th Cir. 1982) .................................................. 15

*Degen v. United States,*
517 U.S. 820 (1996) ................................................................. 15

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988) ................................................................... 5

*Factor v. Laubenheimer,*
290 U.S. 279 (1933) ........................................................... 12, 17

*Frisbie v. Collins,*
   342 U.S. 519 (1952).................................................................................9

*Garcia v. Thomas,*
   683 F.3d 952 (9th Cir. 2012) ...............................................................6

*In re Kaine,*
   55 U.S. (14 How.) 103 (1852) ...............................................................6

*Johnson v. Eisentrager,*
   339 U.S. 763 (1950).................................................................................8

*Ker v. Illinois,*
   119 U.S. 436 (1886)............................................................................9, 10

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) .............................................................16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009) ......................................................4, 5, 16

*Medellin v. Texas,*
   552 U.S. 491 (2008).................................................................................8

*Molinaro v. New Jersey,*
   396 U.S. 365 (1970)...............................................................................15

*Nken v. Holder,*
   556 U.S. 418 (2009)...............................................................................17

*Ntakirutimana v. Reno,*
   184 F.3d 419 (5th Cir. 1999) .............................................................12

*Sidali v. INS,*
   107 F.3d 191 (3d Cir. 1997)...................................................................5

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004).................................................................................8

iii

*United States v. Alvarez-Machain*,

   504 U.S. 655 (1992) ..................................................................................9, 10, 12

*United States v. Blanco*,

   861 F.2d 773 (2d Cir. 1988) ............................................................................ 15

*United States v. Khalupsky*,

   No. 15-CR-381, 2018 WL 3127226 (E.D.N.Y. May 29, 2018) ................................ 11

*United States v. Knotek*,

   925 F.3d 1118 (9th Cir. 2019) ...........................................................................5

*United States v. Nabepanha*,

   200 F.R.D. 480 (S.D. Fla. 2001) ...................................................................... 15

*United States v. Najohn*,

   785 F.2d 1420 (9th Cir. 1986) ......................................................................... 11

*United States v. One Lot of U.S. Currency Totaling $506,537.00*,

   628 F. Supp. 1473 (S.D. Fla. 1986) ................................................................. 15

*United States v. Rauscher*,

   119 U.S. 407 (1886) ....................................................................................... 11

*United States v. Struckman*,

   611 F.3d 560 (9th Cir. 2010) ........................................................................... 10

*United States v. Tuzman*,

   No. 15 Cr. 536, 2015 U.S. Dist. LEXIS 173780 (S.D.N.Y. Dec. 30, 2015).............7

*United States v. Van Cauwenberghe*,

   934 F.2d 1048 (9th Cir. 1991) ......................................................................... 15

*United States v. Verdugo-Urquidez*,

   494 U.S. 259 (1990) .........................................................................................8

*United States v. Verdugo-Urquidez*,

   939 F.2d 1341 (9th Cir. 1991) ......................................................................... 11

iv

*Winter v. Natural Res. Defense Counsel, Inc.*,

    555 U.S. 7 (2008) ........................................................................ 1,4, 16, 17

*Zadvydas v. Davis*,

    533 U.S. 678 (2001) ................................................................................ 8

*Zepeda v. INS*,

    753 F.2d 719 (9th Cir. 1985) ................................................................ 5

**Statutes**

18 U.S.C. § 3181(a) ...................................................................... 11, 14

18 U.S.C. § 3181(b) ............................................................................ 11

18 U.S.C. § 3184 .................................................................................. 6

18 U.S.C. § 3186 .................................................................................. 6

**Other Authority**

*United Nations Convention Against Transnational Organized Crime of November 15,*

    *2000*, Dec. 13, 2000, S. Exec. Rep. No. 109-4, 40 ILM 335 (2001)...........……8, 13-14

1    Defendants hereby oppose Plaintiff's Motion for a Preliminary Injunction, ECF

2 No. 14, and submit the following memorandum of points and authorities in support.

3                    **MEMORANDUM OF POINTS AND AUTHORITIES**

4 **I.    INTRODUCTION**

5        This case involves the extradition of Plaintiff Hakop Meneshian ("Meneshian"),

6 an Armenian citizen, from Ukraine, to stand trial on a murder charge currently pending

7 in Los Angeles County.  Meneshian asks this Court to issue a preliminary injunction

8 requiring the United States government to recall its request for his extradition and

9 generally prohibiting it from seeking his extradition from Ukraine.  In support thereof, he

10 argues that the extradition request violates his right to due process and international law

11 principles because it lacks a valid legal basis, given the absence of an extradition treaty

12 between the United States and Ukraine, or a statute or congressional-executive

13 agreement authorizing extradition between the two countries.  His argument is meritless.

14 No court has ever enjoined the government in its pursuit of a fugitive's extradition to the

15 United States, as Meneshian requests, and this Court should not be the first.

16        A preliminary injunction is "an extraordinary remedy."  *Winter v. Natural Res.*

17 *Defense Counsel, Inc.*, 555 U.S. 7, 22 (2008).  The Supreme Court has made clear that to

18 justify such an exercise of this Court's discretion, the movant bears the burden of

19 showing four factors—including, critically, a likelihood of success on the merits of his

20 claims.  Meneshian has failed to carry that burden.

21        He has no likelihood of success in this case because this Court lacks subject matter

22 jurisdiction over the United States' decision to seek his extradition, a matter that falls

23 exclusively within the purview of the executive branch.  Even putting aside this

24 threshold matter, Meneshian's claims fail for four additional, independent reasons: (1) as

25 an alien located outside the United States, he has no due process right to avoid his return

26 to the United States, (2) his contention that the United States needs a bilateral extradition

27 treaty with Ukraine or other agreement or enactment to provide a legal basis for its

28

                                          1

extradition request is unfounded and contrary to well-established Supreme Court precedent, (3) the United States and Ukraine are party to a multilateral treaty under which Ukraine has agreed to entertain U.S. extradition requests, and (4) Meneshian should be permitted to contest his criminal case only after he is returned to the United States, as any other criminal defendant. Moreover, Meneshian fails to articulate any cognizable injury or interest that would support the issuance of the injunction he seeks. Accordingly, the Court should deny Meneshian's motion.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

This case arises out of the United States' request for Meneshian's extradition to stand trial in Los Angeles Superior Court on a charge of murder. As alleged by a deputy district attorney for Los Angeles County, on September 25, 2013, just after 2:00 a.m., Meneshian engaged in a heated verbal exchange with the victim, Romaine Breda ("Breda"), inside Mike's Smoke Shop on Hollywood Boulevard. ECF No. 14-4 at 9. Shortly thereafter, Meneshian and a friend pulled up in a BMW next to Breda and a group of his friends as they were walking along Hollywood Boulevard. *Id.* Meneshian and his friend got out of the car; yelled, "West side, Armenian Power, this is our hood!"; stabbed Breda multiple times; and then fled. *Id.* at 9-10. Breda subsequently died as a result of the stab wounds. *Id.* at 10.

According to a Los Angeles homicide detective, Meneshian is a known associate of a criminal street gang in Los Angeles called Armenian Power, which has claimed the territory in which the murder occurred. *Id.* at 31. Law enforcement compiled six photographs of potential suspects for Breda's murder and showed them to one of Breda's friends who was present at the time of the stabbing. *Id.* at 32. The friend identified a photograph of Meneshian as the person who had stabbed Breda. *Id.* When authorities went to Meneshian's residence shortly after the murder, they learned that Meneshian had moved out that month (September 2013). *Id.* at 10.

Meneshian was charged with one count of murder by way of a felony complaint on January 24, 2014, and a warrant for his arrest was issued the same day. *Id.* at 6. The complaint was amended on March 4, 2019, to add a gang allegation for sentencing purposes, and a new arrest warrant was issued at that time. *Id.* at 6-7.

Law enforcement located Meneshian in Armenia in September 2017, and then learned that he had traveled to Ukraine in March 2018. *Id.* at 10. He was arrested in Odessa, Ukraine in March 2019, on the basis of an Interpol Diffusion Notice identifying the pending charges against him. ECF No. 14 at 7; *see* ECF No. 14-3 at 2. On or around April 8, 2019, the U.S. Department of State transmitted a formal request for Meneshian's extradition through the diplomatic channel to the government of Ukraine. ECF No. 14-3 at 2; Declaration of Tom Heinemann ("Heinemann Decl."), attached hereto as Exhibit A, ¶ 8.[1] Meneshian has been detained in Ukraine throughout the pendency of the extradition proceedings there.

On October 31, 2019, approximately eight months after his arrest in Ukraine, Meneshian filed a complaint in this District seeking a preliminary and permanent injunction "ordering the United States and the Attorney General of the United States to stop and immediately recall the request for [his] extradition." ECF No. 1 ¶¶ 23, 31. On

---

[1] Although Meneshian claims that "[t]he official extradition request was transmitted to Ukraine's General Prosecutor's Office by . . . the Director of the Office of International Affairs at the U.S. Department of Justice on or about April 8, 2019," ECF No. 14 at 6, that is incorrect, as even the evidence he offers demonstrates. By way of letter dated May 3, 2019 (*i.e.*, after Meneshian's arrest in Ukraine), the Office of International Affairs advised a Ukrainian official in the Office of the Prosecutor General that U.S. authorities had learned that Meneshian was in possession of an identification document containing a different spelling of his name than that set forth in the extradition request, and clarified that the extradition request sent "via diplomatic channels" on "approximately April 8, 2019," applies to all spellings of Meneshian's name, including "Hakob Meneshyan." 14-3 at 2. As the Department of State explains, a "formal extradition request is always made through the diplomatic channel," and not by the Office of International Affairs, by sending a diplomatic note either from "the U.S. Embassy in the requested country to that country's Foreign Ministry, or in some cases, to the embassy of the requested country in the United States." Heinemann Decl. ¶ 4.

November 5, 2019, Meneshian served the complaint on the Civil Process Clerk for the U.S. Attorney's Office for the Central District of California.  The same day, without notice to or consultation with the government pursuant to Local Rule 7-3, Meneshian filed the instant motion for a preliminary injunction, and a hearing thereon was set for December 9, 2019.  ECF No. 14.  On November 15, 2019, the hearing was continued to December 16, 2019.  ECF No. 15.[2]

## III.  ARGUMENT

This Court should deny Meneshian's motion because he has failed to meet any of the requirements for the issuance of a preliminary injunction, as discussed below.

### A.  Legal Standard

A preliminary injunction is "never awarded as of right," but rather only "upon a clear showing that the [movant] is entitled to such relief."  *Winter*, 555 U.S. at 22, 24. To obtain a preliminary injunction, the moving party must demonstrate that (1) he is likely to succeed on the merits of its claims; (2) he is likely to suffer irreparable injury in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) the proposed injunction is in the public interest.  *Id.* at 20.[3]

"A preliminary injunction can take two forms."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009).  "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Id.* (citation and internal quotation marks omitted).  By contrast, "[a] mandatory injunction orders a responsible party to take action." *Id.* at 879 (citation and internal quotation marks omitted).  The latter "goes well

---

[2] The Court also entered the parties' stipulation requiring this opposition to be filed on or before November 22, 2019, and Meneshian's reply to be filed on or before December 2, 2019.

[3] The same factors apply when a party seeks a permanent injunction, except that the party must show "actual success" on the merits rather than just a likelihood.  *Winter*, 555 U.S. at 32 (citation omitted).

4

1   beyond simply maintaining the status quo pendente lite and is particularly disfavored."
2   *Id.* (citation and internal brackets omitted).  Thus, "[i]n general, mandatory injunctions
3   are not granted unless extreme or very serious damage will result and are not issued in
4   doubtful cases[.]"  *Id.* (citation and internal quotation marks omitted).

5   **B.     The Court Lacks Subject Matter Jurisdiction to Grant the Requested**
6   **Injunction**

7        As a threshold matter, a federal court may issue an injunction only "if it has . . .
8   subject matter jurisdiction over the claim."  *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.
9   1985).  Here, the Court lacks subject matter jurisdiction over Meneshian's claims
10  because the question of whether to seek a defendant's extradition is a matter of foreign
11  policy, which falls squarely—and solely—within "the province and responsibility of the
12  Executive."[4]  *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (citation omitted); *see*
13  *also, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical
14  gloss on the 'executive Power' vested in Article II of the Constitution has recognized the
15  President's vast share of responsibility for the conduct of our foreign relations.  While
16  Congress holds express authority to regulate public and private dealings with other
17  nations in its war and foreign commerce powers, in foreign affairs the President has a
18  degree of independent authority to act.") (citations and internal quotation marks
19  omitted).

20       "[E]xtradition is a diplomatic process carried out through the powers of the
21  executive, not the judicial, branch."  *Blaxland v. Commonwealth Dir. of Public*
22  *Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003); *see also United States v. Knotek*, 925
23  F.3d 1118, 1124 (9th Cir. 2019) ("As we have stated on many occasions, extradition is a
24  matter of foreign policy[.]") (internal quotation marks and brackets omitted); *Sidali v.*
25  *INS*, 107 F.3d 191, 194 (3d Cir. 1997) ("Because the power to extradite derives from the

26
27  [4] The term "extradition" is used herein to refer only to international extradition
     matters, and not to extraditions between U.S. states, which follow a separate and
28   unrelated process.

5

President's power to conduct foreign affairs, extradition is an executive, not a judicial, function.").  Given that "[e]xtradition is primarily a function of the executive branch, . . . the judiciary has no greater role than that mandated by the Constitution, or granted to the judiciary by Congress."  *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993), *cert. denied*, 510 U.S. 1165 (1994).  Neither the Constitution nor any statute provides a role for the judiciary where the executive branch exercises its Article II powers to ask a foreign government to extradite an individual charged with a crime in the United States.

While Congress has carved out a limited role for the judiciary in cases where a foreign government submits an extradition request to the United States, the same is not true in the reverse.  Specifically, pursuant to 18 U.S.C. § 3184, U.S. courts are empowered to consider a foreign government's extradition request and certify to the U.S. Secretary of State whether there is "evidence sufficient to sustain the charge [against the fugitive] under the provisions of the proper treaty or convention, or under section 3181(b)," before the fugitive may be extradited.  *See* 18 U.S.C. § 3184 (discussing fugitives charged "with having committed within the jurisdiction of [a] foreign government [certain] crimes"); *In re Kaine*, 55 U.S. (14 How.) 103, 110 (1852) ("That an Executive order of surrender to a foreign government is purely a national act, is not open to controversy; nor can it be doubted that this executive act must be performed through the Secretary of State by order of our Chief Magistrate representing this nation. But it does not follow that Congress is excluded from vesting authority in judicial magistrates to arrest and commit, preparatory to a surrender.").  There is no similar authority applicable to cases where the United States submits an extradition request to a foreign country.[5]

---

[5] And, even in the context of a foreign country's extradition request submitted to the United States, the decision of whether to extradite the fugitive is reserved solely for the Secretary of State, and not the judiciary.  *See* 18 U.S.C. § 3186; *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012).

1    Indeed, the government is aware of no case in which a court has enjoined the
2    United States from seeking a criminal defendant's extradition.  To the contrary, at least
3    one court has rejected a defendant's request for such an injunction.  In *Casey v. Dep't of*
4    *State*, the D.C. Circuit affirmed the dismissal of a lawsuit filed by a defendant for a
5    preliminary and permanent injunction preventing the State Department from seeking his
6    extradition from Costa Rica based on alleged misrepresentations purportedly in violation
7    of his statutory, constitutional, and treaty-based rights.  980 F.2d 1472, 1475 (D.C. Cir.
8    1992).  The court held that it lacked subject matter jurisdiction over the case based in
9    part on its conclusion that "the State Department has a latitude in conducting extraditions
10   analogous to a prosecutor's discretion . . . [and] may enjoy even greater freedom because
11   of the judiciary's traditional deference to the executive branch's conduct of foreign
12   affairs."  *Id.* at 1478.  In the court's view, entering the requested injunction would
13   impermissibly "raise separation of powers concerns."  *Id.*  This Court should likewise
14   deny the injunction requested by Meneshian based on a lack of subject matter
15   jurisdiction.[6]  *See id.*; *see also, e.g.*, *United States v. Tuzman*, 2015 U.S. Dist. LEXIS
16   173780, at *11, 13 (S.D.N.Y. Dec. 30, 2015) (concluding that the court "has no authority
17   to issue" an order "directing the United States to cease its efforts to obtain [the
18   defendant's] extradition from Colombia," where the fugitive's request "invite[d] this
19   Court to interfere with matters that are within the purview of the Executive Branch").

20   ### C.    Meneshian Has No Likelihood of Success on the Merits

21           Even if this Court had subject matter jurisdiction over this case, Meneshian would
22   still have no likelihood of prevailing.  He does not have a constitutional right to avoid his
23   return to the United States, as he claims.  Even if he did have such a right, there would

24

25           [6] Because the request for Meneshian's extradition is a Department of State matter,
26   *see* Heinemann Decl. ¶¶ 4, 8 (describing that the request was made through the
     diplomatic channel, *i.e.*, via a diplomatic note prepared by the Department of State),
27   based on a State of California prosecution, U.S. Attorney General William Barr is not a
     proper defendant and should be dismissed from this case
28

be no violation because defendants may be returned to the United States even in the absence of a bilateral extradition treaty or other authority.  And, regardless, the United Nations Convention Against Transnational Organized Crime of November 15, 2000 ("UNTOC")[7] provides a legal basis for the United States' request for Meneshian's extradition.  Moreover, Meneshian's challenges to his criminal case should be heard only after his return to the United States pursuant to the fugitive disentitlement doctrine. Accordingly, his claims fail.

> 1.   Meneshian Has No Fifth Amendment Due Process Right to Avoid Return from Ukraine

"It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  The Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990).  The right to due process is afforded upon "[m]ere lawful presence in the country."  *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).  Given that Meneshian is an alien currently located in Ukraine, his claim seeking relief for an alleged due process violation fails *ab initio*.[8]

---

[7] Dec. 13, 2000, S. Exec. Rep. No. 109-4, 40 ILM 335 (2001).

[8] While Meneshian also asserts that the United States' request for extradition violates general principles of international law prohibiting arbitrary arrest and detention, ECF No. 14 at 12-13, he is incorrect.  His arrest and detention in Ukraine are not arbitrary but rather based upon an outstanding arrest warrant and the underlying criminal charge.  And even if Meneshian were correct, the international law rights he claims are not judicially enforceable in the United States and thus cannot provide a valid basis on which to grant the relief he seeks.  *See Medellin v. Texas*, 552 U.S. 491, 505 n.2 (2008) ("[A] 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law.  Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004) ("[T]he [Universal Declaration of Human Rights] does not of its own force impose obligations as a matter of international law.  And, although the [International

1    Meneshian's reliance on the Supreme Court's ruling in *Boumediene v. Bush*, 553

2    U.S. 723 (2008), that enemy combatants detained at Guantanamo Bay were entitled to

3    habeas corpus relief, is misplaced.  *Cf.* ECF No. 14 at 10-11.  The Court's decision to

4    extend constitutional rights to non-citizen detainees in that case was premised on the fact

5    that "[i]n every practical sense Guantanamo is not abroad; it is within the constant

6    jurisdiction of the United States" and, "while technically not part of the United States, is

7    under the complete and total control of our Government."  *Boumediene*, 553 U.S. at 769,

8    771.  That case is, therefore, inapposite here, where Meneshian is located outside the

9    jurisdiction of the United States, in the custody of the Ukrainian government.

10    Moreover, as Meneshian himself recognizes, he could not prevail on his claim that

11    his return to this country violated due process once he has been returned.  *See* ECF No.

12    14 at 14 (noting that if Meneshian is returned to the United States, he "will have no

13    adequate remedy at law for the violation of his rights").  Indeed, the long-standing *Ker-*

14    *Frisbie* doctrine provides that the means by which a defendant is returned to the United

15    States does not prohibit him from being tried in U.S. court.  *Ker v. Illinois*, 119 U.S. 436

16    (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952); *see United States v. Alvarez-Machain*,

17    504 U.S. 655, 662, 670 (1992) (concluding that, where there is no violation of an

18    extradition treaty, "the court need not inquire as to how respondent came before it," and

19    even a defendant's "forcible abduction does not . . . prohibit his trial in a court in the

20    United States for violations of the criminal laws of the United States").  Thus, a

21    defendant's guarantee of due process does not apply to "the manner in which he may be

22    brought into custody of the law" in a foreign country and then delivered to U.S.

23    authorities; rather, it requires only that "the party is regularly indicted by the proper

24    grand jury in the state court, has a trial according to the forms and modes prescribed for

25    _____

26    Covenant on Civil and Political Rights] does bind the United States as a matter of
international law, the United States ratified the Covenant on the express understanding

27    that it was not self-executing and so did not itself create obligations enforceable in the

28    federal courts.") (citations omitted).

such trials, and when, in that trial and proceedings he is deprived of no rights to which he is lawfully entitled." *Ker*, 119 U.S. at 440.

While courts have recognized a limited exception to this doctrine where the government engaged in "misconduct of the most shocking and outrageous kind" to obtain a defendant's return, Meneshian has alleged no facts that would support the application of that exception here. *See, e.g.*, *United States v. Struckman*, 611 F.3d 560, 571-72 (9th Cir. 2010). Simply demanding a defendant's return, without relying on an extradition treaty or other authority—which, as discussed below, is common, legal, and appropriate—does not meet the "extremely high standard" for that exception to apply. *See id.* at 572-74 (U.S. government's efforts to facilitate the expulsion of a defendant from Panama, while specifically avoiding requesting his demand pursuant to the U.S.-Panama extradition treaty, does not establish an exception to the *Ker-Frisbie* doctrine, despite misstatements made to Panamanian officials) (citation omitted). Even though, as Meneshian notes, the Supreme Court in *United States v. Alvarez-Machain* acknowledged that the abduction of a foreign national by U.S. agents may be "shocking" and "in violation of general international law principles," ECF No. 14 at 12-13, the Court concluded that even that misconduct was insufficient to warrant an exception to the *Ker-Frisbie* doctrine. *Alvarez-Machain*, 504 U.S. at 669-70. Meneshian fails to explain how, if he would have no remedy upon his return, he may preemptively be afforded one now, when he is still outside the United States. He may not.

### 2. Extradition May Be Sought Without a Treaty or Other Authority

Even if Meneshian did have some applicable Fifth Amendment rights, his claim for injunctive relief would fail for the independent reason that it is lawful for the United States to seek his return from Ukraine even though it lacks a bilateral extradition treaty with that country, or a statute or congressional-executive agreement authorizing extradition. As the Ninth Circuit has recognized, both the U.S. government and foreign governments have "the discretion . . . to surrender fugitives for reasons of comity,

prudence, or even as a whim," and not based on an extradition treaty or other authority. *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986). The Supreme Court has similarly condoned the surrender of fugitives based "upon the principle of comity," through an exercise of "the discretion of the government whose action was invoked." *United States v. Rauscher*, 119 U.S. 407, 412 (1886). Countries enter into extradition treaties simply "to impose . . . legal obligations on one another under appropriate conditions," and not because there would necessarily otherwise be no legal authority by which to effect extraditions. *See United States v. Verdugo-Urquidez*, 939 F.2d 1341, 1349 (9th Cir. 1991), *cert. granted, judgment vacated on other grounds*, 505 U.S. 1201 (1992); *see, e.g.*, M. Cherif Bassiouni, International Extradition: United States Law and Practice 8 (6th ed. 2014) ("The duty to extradite by virtue of a treaty, whether bilateral or multilateral, is the most common basis for the practice among states, though reciprocity, comity, and national legislation are also used as legal bases relied upon by a number of states."); *id.* at 43 (discussing "[e]xtradition without a [t]reaty").

Accordingly, the United States routinely submits requests for the return of fugitives without relying on an extradition treaty. *See* Heinemann Decl. ¶¶ 2-3, 5. Meneshian points to no law prohibiting this practice—nor does any exist. *See id.* ¶¶ 6, 8. To the contrary, the United States has an established practice of generally making requests to Ukraine for the return of fugitives pursuant to UNTOC or other lawful means under Ukrainian law. *See id.* ¶ 7; *see, e.g.*, *United States v. Khalupsky*, No. 15-CR-381, 2018 WL 3127226 (E.D.N.Y. May 29, 2018) (extradition from Ukraine).

The United States' ability to extradite individuals *to* foreign countries (the reverse of the situation here) in the absence of a treaty has been significantly limited by statute, *see* 18 U.S.C. § 3181(a), but it has not been fully foreclosed even in that context, *see* 18 U.S.C. § 3181(b) (permitting, "in the exercise of comity, the surrender of [certain] persons . . . who have committed [certain] crimes . . . *without regard to the existence of any treaty of extradition with [the relevant] foreign government*," under certain

11

1  circumstances) (emphasis added).  No similar statute limits the United States' ability to

2  extradite individuals, like Meneshian, *from* foreign countries.

3          The three cases to which Meneshian cites, ECF No. 14 at 10, stand for no more

4  than the proposition that treaties, statutes, and congressional-executive agreements may

5  provide a basis for countries to extradite fugitives, and not for the proposition that such

6  legal mechanisms are required in order for countries to extradite fugitives.  *See Factor v.*

7  *Laubenheimer*, 290 U.S. 279, 287 (1933); *Alvarez-Machain*, 504 U.S. at 664 ("In the

8  absence of an extradition treaty, nations are under no obligation to surrender those in

9  their country to foreign authorities for prosecution."); *Ntakirutimana v. Reno*, 184 F.3d

10 419, 427 (5th Cir. 1999) ("[W]e conclude that it is not unconstitutional to surrender [the

11 fugitive] . . . pursuant to [an] Executive–Congressional Agreement.").  The fact that the

12 Supreme Court stated in *Factor v. Laubenheimer* that "the legal right to demand [a

13 fugitive's] extradition *and* the correlative duty to surrender him to the demanding

14 country exist only when created by treaty," 290 U.S. at 287 (emphasis added), does not

15 mean, as Meneshian suggests, that a country needs a treaty simply to submit a request for

16 a fugitive's extradition.  Rather, it means that a non-treaty-based request would not

17 trigger a legal duty on the part of the requested country to surrender the fugitive.  In fact,

18 the *Factor* Court acknowledged that countries may "*voluntarily* exercise the power to

19 surrender a fugitive from justice to the country from which he has fled," presumably

20 upon receipt of a request for the fugitive's surrender not pursuant to a treaty.  *Id.*

21 (emphasis added).  In any event, *Factor*, which is a seminal case on extradition treaty

22 interpretation involving a British request for the extradition of a fugitive located in the

23 United States, does not govern the U.S. request for Meneshian's extradition at issue here.

24 Thus, Meneshian cannot show that the absence of a U.S.-Ukraine bilateral extradition

25 treaty or other law authorizing extradition renders the United States' request for

26 Meneshian's extradition illegal.

27

28

Adopting Meneshian's view that the United States may only seek the return of fugitives pursuant to an extradition treaty or other law would not only be legally incorrect but would also have potentially far-reaching and dangerous consequences.  It would provide impunity to defendants who flee to where the United States has reason not to be a treaty partner with the foreign government, or where the United States has not yet had the opportunity to engage with the foreign government, negotiate and agree on specific terms, and/or ratify an extradition treaty; and it would invalidate important non-treaty law enforcement tools such as those available under other countries' domestic extradition law, exclusion, expulsion, and deportation, which are commonly used to obtain the return of fugitives.  *See* Heinemann Decl. ¶¶ 5-6.  Accordingly, the Court should reject Meneshian's claim.

### 3.   There Is a Valid Treaty Basis for Meneshian's Extradition

Even if applicable law did somehow require that a treaty or other law provide a basis for the United States' request for Meneshian's extradition, such law exists. Although the United States and Ukraine are not parties to a bilateral extradition treaty, they are both parties to a multilateral treaty, UNTOC, which provides a basis for the United States to seek the extradition of defendants who flee to Ukraine.[9]

UNTOC is a treaty intended to combat transnational crime.  It applies to the prosecution of "[c]onduct by a person who, with knowledge of either the aim and general activity of an organized criminal group or its intention to commit the crimes in question, takes an active part in . . . [c]riminal activities of the organized criminal group," *inter*

---

[9] Ukraine signed UNTOC on December 12, 2000, and the United States signed it the following day.  Ukraine then ratified UNTOC on May 21, 2004, and the United States did the same on November 3, 2005.  *See* UN, *Status*, *United Nations Convention against Transnational Organized Crime*, *available at* https://treaties.un.org/pages/View Details.aspx?src=TREATY&mtdsg_no=XVIII-12&chapter=18&clang=_en#8 (last visited November 19, 2019).

13

*alia.* UNTOC, Art. 5(1)(a)(ii).[10]  This would cover the gang murder underlying the request for Meneshian's extradition.

Article 16 of UNTOC provides for the extradition of fugitives wanted for offenses covered by the treaty, so long as the offense for which extradition is sought is criminal in both countries.  Upon its ratification of UNTOC, Ukraine submitted a notification formally "declar[ing] that the Convention constitutes the legal ground for cooperation in the matters of extradition if a request for extradition is received from the State Party to the Convention with which there is no treaty on extradition."  *See* UN, *Notifications Made Under articles 5 (3), 16 (5), 18 (13) and (14), and 31 (6)*, *United Nations Convention Against Transnational Organized Crime*[11]; *see also* Heinemann Decl. ¶ 3.  Thus, through UNTOC, Ukraine agreed to entertain extradition requests from countries such as the United States with which it has no bilateral extradition treaty.  Heinemann Decl. ¶ 3.[12]  Accordingly, Meneshian's claim that there is an "absence of legal authority"

---

[10] In addition, as is relevant here, the conduct must amount to a crime that is "punishable by a maximum deprivation of liberty of at least four years or a more serious penalty" and that is "transnational in nature," meaning that it "involves an organized criminal group that engages in criminal activities in more than one State," such as the gang whose actions in the United States underlie the criminal case against Meneshian. UNTOC, Arts. 2(b) & 3; *see, e.g.*, Department of Justice, Armenian Power Leader Sentenced to 32 Years in Prison for Racketeering, Extortion and Fraud (Nov. 12, 2014) ("Armenian Power leaders worked closely with powerful organized crime figures in Russia and Armenia, known as "thieves-in-law," and members of the Mexican Mafia prison gang to commit criminal activities in the Los Angeles area and elsewhere."), https://www.justice.gov/opa/pr/armenian-power-leader-sentenced-32-years-prison-racketeering-extortion-and-fraud.

[11] *Available at* https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-12&chapter=18&clang=_en#8 (last visited November 19, 2019).

[12] While the United States has not similarly agreed to entertain extradition requests based on UNTOC from countries with which it does not have a bilateral extradition treaty (in light of 18 U.S.C. § 3181(a), as discussed above, *supra* at 11-12), that does not prevent it from relying on UNTOC when submitting extradition requests to other countries, as UNTOC does not make extradition conditional on reciprocity. *Cf. Charlton v. Kelly*, 229 U.S. 447, 476 (1913) ("extradition treaties need not be reciprocal").

for the United States' submission of its extradition request to Ukraine is incorrect.  *Cf.*
ECF No. 14 at 12.

                4.  <u>Meneshian's Claims Fail Pursuant to the Fugitive Disentitlement</u>
                   <u>Doctrine</u>

      A separate reason that Meneshian does not have a likelihood of success in this
case is that the fugitive disentitlement doctrine prevents him from obtaining the relief he
seeks.[13]  "The fugitive disentitlement doctrine is one of long standing."  *United States v.
Van Cauwenberghe*, 934 F.2d 1048, 1054 (9th Cir. 1991).  It dictates that a party "who
seeks to invoke the processes of the law while flouting them has no entitlement 'to call
upon the resources of the Court for determination of his claim.'"  *Conforte v. Comm'r of
Internal Revenue*, 692 F.2d 587, 589 (9th Cir. 1982) (quoting *Molinaro v. New Jersey*,
396 U.S. 365, 366 (1970)).  As is particularly relevant here, the doctrine is intended in
part to "discourage[] the felony of escape and encourage[] voluntary surrenders."  *Degen
v. United States*, 517 U.S. 820, 824 (1996) (citation omitted).  It applies with even
"greater force in civil cases," than it does in criminal cases, *Conforte*, 692 F.2d at 589, to
afford courts discretion to dismiss a fugitive's claims on the basis that it would be
inequitable for the fugitive to "use this Court's processes as a sword while attempting to
simultaneously shield himself from the same type of judicial process," *United States v.
One Lot of U.S. Currency Totaling $506,537.00*, 628 F. Supp. 1473, 1476 (S.D. Fla.
1986).

      Granting injunctive relief in this case would enable Meneshian to avoid standing
trial on the state criminal charges against him altogether.  In effect, he would be allowed
"to preview or test the strength of the government's evidence without being subject to
the court's jurisdiction," thereby obtaining an "improper advantage" by "receiv[ing]
potential benefits while risking nothing."  *United States v. Nabepanha*, 200 F.R.D. 480,

---

[13] "A person can be said to be a fugitive when, while abroad, they learn that they
are under indictment and make no effort to return to the United States to face charges."
*United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988).

483 (S.D. Fla. 2001) (denying fugitive's request for discovery).  Meneshian will be afforded the full panoply of rights and defenses afforded to every defendant once he has been returned to the United States.  He should not be afforded any greater rights simply because he has fled to a foreign country.

### D.   Meneshian Fails to Show that He Will Suffer Irreparable Injury Absent Injunctive Relief

To satisfy the irreparable injury prong of the preliminary injunction standard, a plaintiff must demonstrate "immediate threatened harm," *see Caribbean Soup Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988), which is "specific to his or her case, as opposed to a [harm] that would apply equally well to all [similar cases]," *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).  Merely showing a "possibility" of irreparable harm is insufficient.  *See Winter*, 555 U.S. at 22.  Where a plaintiff seeks a mandatory injunction, the requested relief should not be granted unless "extreme or very serious damage will result."  *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879.

Here, Meneshian fails to explain how the lack of a remedy upon his return to the United States and the disruption of his life abroad would constitute *irreparable* harm. Those claims are tempered by [his] ability to defend himself at trial in [the United States]," *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986), and his ability to return to Ukraine after trial (and serving a sentence, if one is imposed).  Moreover, Meneshian's vague assertion that he "could be killed or seriously injured while detained in Odessa, Ukraine or after his extradition to the United States" appears to be purely speculative and belied, at least in part, by the fact that he has been imprisoned in Ukraine for over eight months and fails to identify that any specific threats to his life have been made.  Accordingly, Meneshian has not carried his burden of demonstrating that he will suffer irreparable injury absent the entry of the injunction he seeks.

### E.     The Balance of Hardships and Public Interest Weigh Against Entering an Injunction

A party seeking a preliminary injunction must demonstrate that the "balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In a case involving an international extradition such as this one, the Court should "consider 'strongly' the public interest as an additional factor."  *Artukovic*, 784 F.2d at 1355 (citation omitted).

As the Supreme Court stated in *Factor*, "[t]he surrender of a fugitive, duly charged in the country from which he has fled with a nonpolitical offense and one generally recognized as criminal at the place of asylum, involves no impairment of any legitimate public or private interest."  290 U.S. at 298.  To the contrary, as Meneshian himself notes, "[t]he public interest is served by the orderly extradition of criminal defendants."  ECF No 14 at 14.  Here, the people of Los Angeles County, as well as Breda's family in particular, have a strong interest in seeing the person responsible for Breda's violent murder brought to justice.  The investigation of that murder has established Meneshian as the perpetrator to date.  The public interest, therefore, lies in preserving the U.S. government's ability to secure Meneshian's return to face the charges against him.

In support of his claim to the contrary, Meneshian simply repeats his mislaid claims that the United States lacks authority to request his extradition and his non-specific assertions of irreparable harm.  Those claims are unavailing for the reasons set forth above.  Thus, the balance of hardships and public interest weigh in favor of denying Meneshian's request for a preliminary injunction.

## IV.   **CONCLUSION**

For the foregoing reasons, this Court should deny Meneshian's request for a preliminary injunction.  The government respectfully suggests that this matter involves clear-cut issues that may be resolved on the papers, without the need for a hearing.

For the same reasons, Meneshian has failed to state a claim upon which the injunctive relief he seeks in this case could be granted.  Accordingly, the Court should also dismiss the case with prejudice.

Dated: November 22, 2019                 Respectfully submitted,

CHRISTOPHER J. SMITH
Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
KATELYN B. BENTON
Trial Attorney

_/s/ Rebecca A. Haciski_
REBECCA A. HACISKI
Trial Attorney

**Attorneys for Defendants**